**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | | |
|---|---|---|
| CHERYL A. MUNDAY, and MARGARET DEVINE, *on behalf of themselves and others similarly situated*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 9:20-cv-02144-DCN |
| vs. | ) ) | |
| | ) ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| BEAUFORT COUNTY, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

The following matter is before the court on plaintiffs Cheryl A. Munday ("Munday") and Margaret Devine's ("Devine") (together, "plaintiffs") complaint against defendant Beaufort County ("Beaufort County"). ECF No. 12, Amend. Compl.; see ECF No. 82.[1] For the reasons set forth below, the court finds for plaintiffs.

## I.  PROCEDURAL HISTORY

This matter arises from Beaufort County's use of strip searches exclusively for female pre-classification detainees at the Beaufort County Detention Center ("BCDC"). See Amend. Compl. Plaintiffs filed the instant case on March 6, 2020 in the Beaufort County Court of Common Pleas on behalf of themselves and a class of all similarly situated women.[2] ECF No. 1-1, Compl. On June 5, 2020, Beaufort County removed the

---

[1] By virtue of the court's March 27, 2023 order, Beaufort County is the only remaining defendant in this case. See ECF No. 82.

[2] Plaintiffs defined the class as:

[A]ll women who have been admitted to the Beaufort County Detention Center while waiting for bail to be set or for an initial court appearance, women who have been arrested on default warrants and held in the Beaufort County Detention Center, and women who have been held in protective

case to federal court.  ECF No. 1.  This case was referred to Magistrate Judge Molly

Cherry for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A)

and (B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.).  On August 5, 2020, plaintiffs filed

an amended complaint, now the operative complaint.  ECF No. 12, Amend. Compl.

Plaintiffs asserted various state and federal claims against Beaufort County, Assistant

County Administrator for the Public Safety Division Philip Foot ("Foot"), Director of the

BCDC Colonel Quandara Grant ("Director Grant"), John Does 1–5 (described as "BCDC

Supervisory Defendants"), and Jane Does 1-5 (described as "BCDC Officer Defendants")

(collectively, "defendants").  Amend. Compl. ¶¶ 7–11.

On March 27, 2023, this court issued an order resolving a motion for summary

judgment which dismissed all claims against the individual defendants and dismissed

many of the claims brought against Beaufort County, but it denied the motion as to

plaintiffs' claim of violation of the equal protection clause against Beaufort County under

42 U.S.C. § 1983, as well as plaintiffs' request for attorneys' fees under 42 U.S.C.

§ 1988(b).  ECF No. 82.  On August 1, 2023, the court denied defendants' motion for

---

custody in the Beaufort County Detention Center . . . . These women have
all been unlawfully subjected to routine strip searches, including degrading
visual body cavity searches of their anuses and vaginas.

Amend. Compl. ¶ 4.  The court granted plaintiffs' motion for certification on July 14,
2022 to the following class:

Female pre-classification detainees in the custody of BCDC who, upon their
admission to BCDC, were strip/visual body cavity searched, while pre-
classification males were not, from February 27, 2015, until May 5, 2020 [(the
"class period")], excluding any and all women who returned to BCDC from a bond
hearing or other matter outside of BCDC.

ECF No. 68.

reconsideration of that order. ECF No. 104. On June 13, 2023, plaintiffs filed a motion for partial summary judgment, ECF No. 93, and the court denied that motion on August 21, 2024, ECF No. 129.

Beginning August 14, 2025, the court held a two-day bench trial for the threshold issue of whether, as a matter of law, Beaufort County is subject to liability for the alleged constitutional violation under 28 U.S.C. § 1983 pursuant to Monell v. N.Y. City Dept. of Soc. Serv., 436 U.S. 658 (1978). See ECF Nos. 154, 155. The court filed the official transcript of the bench trial on September 19, 2025. ECF No. 156, Tr.

Having considered the testimony and exhibits admitted at trial, as well as the parties' pre-trial briefs and post-trial proposed findings and conclusions, the court now makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## II.  FINDINGS OF FACT[3]

### A. Governing Structure of Beaufort County and BCDC

1. Beaufort County operates under a council-administrator form of government pursuant to the Home Rule Act. Tr. 148:16–20; see S.C. Code Ann. § 4-9-10(b).

2. Under this form, the elected Beaufort County Council was required to "employ an administrator." S.C. Code Ann. § 4-9-20, see Tr. 42:3–4.

3. The County Administrator is "the administrative head of the county government and [is] responsible for the administration of all the departments of the county," S.C. Code Ann. § 4-9-620; see Tr. 191:15–21, by "execut[ing]

---

[3] The court's findings of fact are based on the preponderance of the evidence presented to the court at the bench trial.

the policies, directives and legislative actions of the council," S.C. Code Ann. § 4-9-630(2).

4.  Among other duties, the County Administrator "direct[s] and coordinate[s] operational agencies and administrative activities of the county government," S.C. Code Ann. § 4-9-630(3), and is solely responsible for directing and supervising Beaufort County officers and employees. S.C. Code Ann. § 4-9-660; see Tr. 148:21–149:4. Accordingly, "neither the council nor its members shall give orders or instructions to any such officers or employees." Id.; see Tr. 31:20–24.

5.  All of Beaufort County's approximately 1,200 employees reported to the County Administrator. Tr. 42:7–8.

6.  At all times relevant, Beaufort County's County Administrator employed a deputy county administrator and several assistant county administrators, each of whom oversaw various offices and departments of the county government operation while under the authority of the County Administrator. Tr. 148-49. Tr. 42:9–16, 148:7–149:10.

7.  The County Administrator delegated supervisory authority over BCDC to the Assistant County Administrator for Public Safety, who reported to the County Administrator. Tr. 13:13–14:11, 157:17–23, 188:25–10, 288–89.

8.  Because the sheriff of Beaufort County "devolved" all custody and duties related to BCDC to the County Council, Tr. 149:11–14; see S.C. Code Ann. § 24-5-12, the County Administrator appointed a "facility manager" for BCDC, Tr. 149:11–14; see S.C. Code Ann. § 24-5-20.

4

9. Beaufort County gives the facility manager for BCDC title of "Director".  Tr. 53:6–8.

10. The Director reports to the County Administrator through the Assistant County Administrator for Public Safety.  Tr. 13:13–21; see Pl. Ex. 13.

11. The Director maintains a policy manual containing all policies and procedures for the operation of BCDC.  Tr. 56:18–20.

12. Pursuant to the authority granted by the County Administrator in the BCDC policy manual, the Director is the "chief administrator" of BCDC and oversees the management of all BCDC personnel, inmates, programs, and buildings.  Tr. 64:2–65:2,154:4–155:20, 189:6–10, 262:13–20; see Pl. Ex. 3 § I.

13. The Director possessed the sole authority to establish, approve, and implement all policies and procedures related to BCDC's operations, staff members, and detainees.  Tr. 55:14–58:12; see Pl. Ex. 4, § III.

14. The Director was responsible for ensuring that all BCDC policies and procedures were in compliance with applicable laws.  Tr. 58:17–21; see Pl. Ex. 11.

15. The Director was required to provide year-end reports to the County Administrator regarding the operation of BCDC.  Tr. 76:14–22, 130:3–7.  The Director's year-end reports were provided to the Beaufort County Council, including policies concerning inspections and detainee contraband.  Tr. 173:8–174:2.

16. Director Grant was the Director of BCDC during the class period.  Tr. 52: 9–15. She was hired by and reported to County Administrator Gary Kubic.  Tr. 53:13–21.

17. Director Grant testified that it was her job to establish policies for BCDC and that, pursuant to the policy manual, doing so was an essential duty of her role as Director of BCDC.[4]  Tr. 58:4–16.

18. Alterations or revisions of BCDC policies were not submitted to or reviewed by the County Administrator's office.  Tr. 257:6–23.

19. Beaufort County's former Deputy County Attorney and Deputy County Administrator during the class period, Joshua Gruber, testified that Director Grant possessed policymaking authority for BCDC.  Tr. 19:7–12.

20. Beaufort County's former Assistant County Administrator for Public Safety and direct supervisor during the class period, Philip Foot, testified that Director Grant possessed policymaking authority for BCDC.  Tr. 263:17–19.

21. Beaufort County's former County Council chairman during the class period, Donald Sommerville, testified that Director Grant possessed authority to adopt policies and procedures for BCDC.  Tr. 195:20–23.  He further testified that the Beaufort County Council neither provided operational guidance to Director Grant, Tr. 195:13–16, nor maintained any formal review process for the BCDC policies and procedures established by Director Grant, including for classification, housing, or searching of inmates at BCDC, Tr. 196:5–9.

---

[4] Beaufort County, in previous briefing to the court, acknowledged that Director Grant was "the relevant policymaker" for BCDC with respect to the strip-search policy at issue in this action.  ECF No. 90 at  8.

22. The Beaufort County council did not provide operational guidance to Director Grant concerning BCDC.  Tr. 195:13–16.  The Beaufort County Council's interaction with Director Grant was only for annual budget approval.  Tr. 209:15–210:5.

23. The Beaufort County Council did not consider or adopt ordinances related to the operational policies or procedures of BCDC, including for deterrence of contraband, housing inmates, or intake procedures.  Tr. 208:3–210:5; see Pl. Exs. 23–25.

24. No member of the Beaufort County Council visited BCDC to examine the operation of the facility as authorized by the South Carolina Minimum Standards for Local Detention Facilities in South Carolina (the "S.C. Minimum Standards").  Tr. 197:20–199:7; see Pl. Ex. 12.

25. Neither the Beaufort County council nor the County Administrator exercised their authority to create policy for BCDC or to revise policies created by Director Grant. Tr. 32:2–37:12, 175:24–179:1, 188:16–189:11, 196:5–197:1, 216:12–16.  When Director Grant revised BCDC's classification and housing policies due to changes in the law related to rape elimination and classification of juveniles, she notified the County Administrator only in her year-end reports. Tr. 84:6–13, 319:2–322:24; see Pl. Ex. 51–58.  Neither the Beaufort County Council nor County Administrator requested that Director Grant revise or rescind those policies, and at no time was Director Grant told that she lacked authority to make them.  Tr. 84:6–13, 319:2–322:24

26. The testimony and evidence established that Director Grant possessed policymaking authority for BCDC.  At no time did the Beaufort County Council or County Administrator exercise authority over polices or procedures of BCDC, and they did so with knowledge of the policies and procedures in place and without formal review and approval processes.  Tr. 32:2–37:12, 175:24–179:1, 222:14–224:20.

**B.  BCDC**

27. BCDC was first occupied in 1992.  Tr. 67:19–21.  Per the SC Minimum Standards, BCDC is a Type IV Facility that "houses persons awaiting court, civil contempt orders, and inmates sentenced to three months or less."  Tr. 54: 10–17.

28. Detainees at BCDC can be divided into three classes: (1) those involved in the intake and admissions ("booking") process; (2) those who have been booked but are awaiting a bond hearing and therefore have not been classified ("pre-class"); and (3) those who have been classified for further detention ("general population").  Pl. Ex. 10.[5]

29. The SC Minimum Standards require that booking detainees must be separated from general population during intake process.  Tr. 86:15–21; see Pl. Ex. 12, § 2014-12.

---

[5] Other classification levels exist (e.g., maximum security, suicide watch) but those are not relevant to this action.

30. At the conclusion of the intake process, detainees are moved to a pre-class unit.  After a bond hearing, detainees may be classified into general population.  See Pl. Ex. 10, § III.A.

31. BCDC has two main housing pods—A and B—that contain multiple units (e.g., Units A-1, A-2, B-1, B-2).  See Pl. Ex. 30.  Since opening and at all times during the class period, female pre-class detainees at BCDC were housed in Unit B-1.[6]  Tr. 91:1–5, 250:22–251:1; see Pl. Ex. 9, § IV.F.14.f.

32. Regardless of classification, all BCDC women detainees—including pre-class, general population, and maximum-security classified—were housed in Unit B-1.  Tr. 90:1–7; see Pl. Ex. 7, § II.A.

33. Within Unit B-1, female pre-class detainees were placed in a separate cell within the general population area.  Tr. 90:8–12.

34. The Unit B-1 female pre-class cell and general population area were separated by a metal door that contained an approximately two-inch gap between the bottom of the door and the floor that could possibly allow for contraband to be passed underneath.  A corrections officer was stationed with Unit B-1 at all times and restricted any interaction between female pre-class and general population detainees. Tr. 92:19–93:3, 255:17–24, 317:7–18:10.

35. The South Carolina Department of Corrections ("SCDOC") performed annual inspections of BCDC, issuing reports as to the facility's compliance with the

---

[6] State law requires that in all "local detention facilities in the State, a separation of the sexes must be observed at all times."  S.C. Code Ann. § 24-13-10.  Section 1094(a) of the SC Minimum Standards require that "[f]emale inmates shall be housed in an area separated from normal auditory and visual contact with male inmates."

SC Minimum Standards. Tr. 85:15–19. The SCDOC annual reports were sent to the County Administrator and BCDC Director. Tr. 130:3–7; see Pl. Exs. 60–67.

36. From 2005 to 2021, SCDOC reported that BCDC failed to comply with the SC Minimum Standards because it was improperly housing pre-class female detainees with general population. Tr. 88:22–25, 143:8–144:4, 166:9–167:2, 185:10–186:9; see Pl. Ex. 63–64.

37. The Beaufort County Council retained consultants to study the BCDC facility and its needs in 2000, 2008, and 2017. Tr. 68:7–10, 202:1–9, 314:3–5; see Pl. Exs. 28–29, 68. Each study stated that BCDC had overcrowding issues in inmate housing, and each study highlighted likely future capacity concerns due to BCDC's inability to separately house detainees by classification. Tr. 71:21–76:3; see Pl. Exs. 28 at 8.

38. The 2000 study expressly stated that the effectiveness of BCDC's operation was compromised by its capacity limitations and inability to properly separate and house female inmates based on classification. Tr. 69:20–70:4; see Pl. Ex. 68 at 4.

39. The 2008 study identified that BCDC had far exceeded its projected growth calculated in the 2000 study. Tr. 71:21–25; see Pl. Ex. 28 at 2. Therein it was stated that BCDC's daily population averaged at 360 detainees, although the facility had a rated capacity of 255 and operational capacity of 204. Director Grant's testimony explained that BCDC's rated capacity is the number of cells within the facility, and the operational capacity is premised on classification.

Tr. 72:1–73:1. Both the 2008 study and Director Grant's testimony confirmed that BCDC's overcrowding in Unit B-1 was the result of an inability and failure to employ an "effective classification system". Tr. 72:1–73:1; see Pl. Ex. 28 at 9. The 2008 study concluded that inaction in response to overcrowding at BCDC could result in litigation and potential § 1983 liability against Beaufort County. Tr. 74:2–8; see Pl. Ex. 28 at 23.

40. The 2017 study, occurring while Director Grant was in charge of BCDC, found that BCDC had insufficient female pre-class housing. Tr. 74:6–75:5; see Pl. Ex. 29. Deputy County Administrator Joshua Gruber, Assistant County Administrator for Public Safety Philip Foot, and Director Grant were all involved in the 2017 study, meeting with the consultant team to discuss facility data, policies, and operational needs of BCDC. Tr. 75:6–8; see Pl. Ex. 29 at 131–39. As part of the 2017 study, Director Grant and other BCDC staff submitted questionnaires regarding BCDC's needs and explicitly noted the need for separate pre-class housing. Tr. 75:9–24; see Pl. Ex. 29 at 141–151.[7]

41. All three studies—2000, 2008, and 2017—concluded with recommendations that BCDC should expand its facility in order to remedy the overcrowding of female detainees. Tr. 75:25–76:8; see Pl. Exs. 28–29, 68.

---

[7] Specifically, in response to a request for "suggestions or concerns" about BCDC needs, Director Grant responded: "Separate segregation unit for female inmates." Pl. Ex. 29 at 151. BCDC's Second Shift Supervisor also expressed his concern that "[t]here is not enough room/areas to house different classification levels such as females." Pl. Ex. 29 at 185. In response to a request for "suggestions or concerns" about BCDC needs, the Intake Corporal/Shift Sergeant noted: "Need a larger female unit as well as a separate admin seg/disciplinary seg unit." Pl. Ex. 29 at 204.

42. SCDOC annual inspection reports mentioned deficiencies in BCDC's female pre-class facilities. Tr. 88:22–89:2.

43. At no time did the Beaufort County Council, County Administrator, or Director Grant restructure Unit B-1 in response to the 2000, 2008, and 2017 studies or SCDOC inspection reports. There was no proposal for or creation of a separate unit within BCDC for female pre-class detainees from general population. Tr. 115:13–15, 175:8–11, 209:2–210:3, 230:11–233:9; see Pl. Ex. 27, ¶ 5.

44. Beaufort County has housed male pre-class detainees separately from male general population since BCDC opened in 1992. Tr. 250:7–10. In 2004, Beaufort County constructed a new, sixteen bed male pre-class unit in a wing that was physically separate from the male general population area. Tr. 250:11–19. SCDOC inspected and certified to the Beaufort County council that the newly constructed male pre-class unit was in compliance with the SC Minimum Standards. Tr. 161:19–163:14; see Pl. Ex. 60. At that time, Beaufort County did not make any changes to BCDC's facility, policies, or practices concerning female pre-class housing. Tr. 250:20–251:1.

**C. BCDC's Policies and Strip-Search of Female Pre-Class Detainees**

45. On February 27, 2015, Director Grant authorized the issuance of a memorandum to all BCDC staff members that stated: "Effective this date all inmates being moved for Pre-Class to other areas of the facility will be strip searched as a matter of policy." Pl. Ex. 1 (the "strip-search policy); see Tr. 133:16–19.

12

46. Prior to issuance of the strip-search policy, the BCDC policy manual stated that detainees, male and female, were to be strip searched in two circumstances  First, all detainees moved from pre-class to general population were strip-searched.[8]  Second, an arrestee at booking would be subjected to a strip-search if there was reasonable suspicion that they were in possession of an item of contraband.  Tr. 107:6–9; see Pl. Ex. 8, § IV.B.3.

47. Implementation and compliance with the strip-search policy was mandatory for all BCDC personnel and detainees.  Tr. 20:10–21:1, 108:15–109:16.

48. The strip-search policy had no effect on male pre-class detainees at BCDC— only those moved to another area of the facility after receiving classification at a bond hearing.  Tr. 98:21–99:12.  As confirmed by the testimony of Director Grant, the "Inmate Classification Plan" within the BCDC policy manual effectively contemplated only procedures for the classification and movement of male detainees.  Tr. 95:23–96:8; see  Pl. Ex. 10, §§ I, III.

49. The strip-search policy only affected female pre-class detainees at BCDC.  Tr. 99:13–15.  Because all female detainees were housed in Unit B-1, they were not moved to a different area of the facility, and therefore all female detainees at BCDC were strip-searched at booking.  Further, the strip-search policy required that all female pre-class detainees to be strip-searched independent of

---

[8] The Supreme Court in Florence v. Bd. of Chosen Freeholders of the Cty. of Burlington, 566 U.S. 318 (2012) held that a strip-search may be performed on a detainee moved from pre-class to general population.  Accordingly, there is no dispute that BCDC may lawfully perform strip-searches in that circumstance.

whether there was reasonable suspicion that they were in possession of an item of contraband, unlike male detainees. Tr. 106:2–108:2.

50. Beaufort County estimated that, pursuant to the strip-search policy, over 5,000 strip-searches of pre-class female detainees occurred during the class period. Tr. 112:5–9.

51. Director Grant testified that, in her opinion, BCDC's strip-searching of female pre-class detainees was a "widespread and pervasive practice." Tr. 108:3–7.

52. Prior to drafting and issuing the BCDC strip-search policy, Director Grant did not consult with the Beaufort County Council or County attorney's office.[9] Tr. 17:4–11, 67:5–8, 117:16–18, 134:7–23. At no time did the Beaufort County Council, County Administrator, or County attorney formally receive, evaluate, approve, or review the strip policy or any policy of BCDC. Tr. 14:24–19:6, 175:24 – 177:6.

53. Director Grant had an informal discussion regarding the strip-search policy with Assistant County Administrator Philip Foot, who had been the most recent Director of BCDC. In response to Director Grant clearly stating the

---

[9] Director Grant testified at her deposition that she also consulted with the county attorney about the strip-search policy change before implementing it; however, at trial, she recanted that testimony, claiming that, in her deposition, when she testified about "policies" she was actually referring to "lesson plans." Tr. 59:7–60:8, 100:22–106:18.

The court does not find Director Grant's effort to change her admission credible. The context of her deposition testimony clearly shows she was responding to questions about the strip-search policy, not lesson plans, a term not even used in her deposition. Her trial testimony also contradicted Beaufort County's concession at a prior hearing that Director Grant's notice to the county attorney constituted notice to Beaufort County of BCDC's strip-search policy. See ECF No. 129 at 20.

14

strip-search policy would affect only to female pre-class detainees, Philip Foot did not object or request a revision to the policy.  Tr. 115:16–188:2.

54. Beaufort County had access to the BCDC policy manual at all times with knowledge that BCDC was not in compliance with the SC Minimum Standards, including the information regarding the strip-search policy, detainee classification, and housing facilities.  Tr. 26:24–28:8, 113:18–21, 158:15–22.

### III.   CONCLUSIONS OF LAW

Having made the findings of fact above, the court turns whether Beaufort County may be subject to liability for the alleged constitutional violation under 28 U.S.C. § 1983 pursuant to Monell v. N.Y. City Dept. of Soc. Serv., 436 U.S. 658 (1978).

Municipalities and other local government units may be held liable under § 1983. Monell, 436 U.S. at 690.  But, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  Id. at 691; see Connick v. Thompson, 563 U.S. 51, 60 (2011) (holding that local governments "are not vicariously liable under § 1983 for their employees' actions").  Beyond identifying a policy or practice that may be attributable to the municipality, the plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original).  In other words, a plaintiff must show that the action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the action and the deprivation of federal rights.  Id.  Indeed, "[t]he first inquiry in any case alleging

15

municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385 (1989).

Thus, a plaintiff who seeks to assert a § 1983 claim against a municipality is obliged to "to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Bd. of Cnty. Comm'rs, 520 U.S. at 403 (citing Monell, 436 U.S. at 694). As interpreted by the Fourth Circuit, a "policy or custom" can exist in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)). The Fourth Circuit has long recognized that Monell and its progeny require the plaintiff to adequately plead and prove the existence of an official policy or custom that proximately caused a deprivation of rights. Walker v. Prince George's Cnty., 575 F.3d 426, 431 (4th Cir. 2009). The identification of a specific municipal policy or custom is a threshold requirement. See Semple v. City of Moundsville, 195 F.3d 708, 712 (4th Cir. 1999).

Stated differently, municipal liability results only when the policy or custom—as defined by one of the four Monell theories—is also (1) fairly attributable to the municipality as its "own" and (2) the "moving force behind the particular constitutional violation. Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987) (first citing Monell, 436 U.S. at 683; and then citing Polk Cnty. v. Dodson, 454 U.S. 312, 326 (1981)). In practical terms, that means that beyond identifying one of the four Monell theories, the

16

plaintiff must also demonstrate that, through the county's deliberate conduct, it was the "moving force" behind the injury alleged. See Bd. of Cnty. Comm'rs, 520 U.S. at 404.

The parties' arguments, evidence, and briefing are confined to two theories of Monell liability: (1) whether the strip-search policy, affecting only female pre-classification detainees but not male pre-classification detainees, was the "decision of a person with final policymaking authority" and (2) whether the exclusive strip-search of female pre-classification detainees was so "persistent and widespread" as to constitute a "custom or usage with the force of law." See Tr.[10] Ultimately, the court finds that Beaufort County may be subject to municipal liability under § 1983 because the strip-search policy giving rise to the alleged constitutional violations was the decision of Director Grant, who was the final policymaker for Beaufort County concerning BCDC.

For purposes of § 1983, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. Riddick v. Sch. Bd. of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). "To qualify as a 'final policymaking official,' a municipal official must have the responsibility and authority to implement final municipal policy with respect to a particular course of

---

[10] The court observed in its August 2024 Order that the practice of strip-searching all female pre-classification detainees, but not all male pre-classification detainees, was not an express policy because it was not a written ordinance, regulation, or enacted legislation. See ECF No. 128 (Lytle, 326 F.3d at 471; Berkley, 63 F.3d at 299).

Further, to establish that § 1983 liability for the omission of a municipality, a plaintiff must demonstrate a deficient program of police training and supervision that results in a constitutional violation committed by untrained or improperly trained officers. Spell, 824 F.2d at 1387–89. Plaintiffs do not claim that an omission or Beaufort County's failure to train its correctional officers and employees caused the alleged constitutional violation in this case. Therefore, Beaufort County cannot be subject to Monell liability under those theories.

action.'" Id. (quoting Pembaur, 475 U.S. at 482–83); see also Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987) ("'[P]olicymaking authority' implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government.").

Under some forms of municipal government, "policymaking responsibility is shared among more than one official or body," but "the mere exercise of discretion by an employee" does not mandate municipal liability under § 1983. City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988). With respect to the decision of a final policymaking official who shares or has been delegated authority in a local government, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur, 475 U.S. at 483–84. Thus, "[w]hen a municipal official's discretionary action 'is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.'" Riddick, 238 F.3d at 523 (citing Praprotnik, 485 U.S. at 127). The Fourth Circuit has explicitly stated that the inquiry is "one of authority-in-fact" and that "[a] municipal governing body may not avoid attribution of policy to itself simply by officially retaining unexercised ultimate authority to countermand a policy or to discipline or discharge the policymaker." Spell, 824 F.2d at 1386 (citing Bowen v. Watkins, 669 F.2d 979, 989 (5th Cir. 1982) ("If a higher official has the power to overrule a decision but as a practical matter never does so, the decision-maker may represent the effective final authority on the question."))

18

As evident from the bench trial, the parties' dispute regarding the identity of the final policymaker for BCDC centers on Director Grant. See Tr. Plaintiffs sought to establish that Director Grant is the final policymaker for Beaufort County in regard to BCDC, and thus Beaufort County is subject to municipal liability under § 1983 premised on the alleged violations caused by her decision to implement the strip-search policy. To carry their burden, they provided testimony and evidence to demonstrate that Director Grant's responsibility and authority were not subject to oversight of the Beaufort County Council or County Administrator. Further, they contended that Director Grant's authority over BCDC is not merely discretionary or limited to operation of the facility. In opposition, Beaufort County's position was that final policymaking authority for BCDC rests with either the Beaufort County Council or County Administrator.

At the outset, "the identification of policymaking officials is a question of state law." Praprotnik, 485 U.S. at 124–25 ("[W]e can be confident that state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business."). Courts are instructed to look to "relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." Riddick, 238 F.3d at 523 (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989) (cleaned up).

In South Carolina, laws concerning corrections and jails are found in Title 24 of the South Carolina Code. See S.C. Code Ann. §§ 24 et seq. At the bench trial, the parties heavily litigated Chapter 5 or Title 24, concerning "jails and jailors," in relation to Beaufort County. See Tr. 149:11–152:25, 191:15–197:1. Therein, the "custody" and

"control" of the county jail is vested in the sheriff. Id. §§ 24-5-10, 20. The sheriff is required to appoint a "facility manager" who "shall have the control and custody of the jail under the supervision of the sheriff." Id. § 24-5-20. However, the sheriff may "devolve all of his powers and duties relating to the custody of the county jail" to the governing body of the county, id. § 24-5-12, and the appointment of a facility manager falls to the county administrator "in whose jurisdiction the jail lies," id. § 24-5-12. The facility manager's statutory duties include: "control and custody of the jail;" reporting the "condition of the jail, the repairs which may be wanted, and their probable cost" to the governing body; and overall management of inmates. See id. §§ 24-5-20, 110, 120, 170.

The court finds that Chapter 5 or Title 24 of the South Carolina Code does not identify the final policymaking official for BCDC for the instant case. See Praprotnik, 485 U.S. at 124–25. In Chapter 5, the only explicit grant of authority over a county jail is to the sheriff. See S.C. Code Ann §§ 24-5-10, 20. The instant case distinguishable from those § 1983 municipal liability cases in which the sheriff, rather than the county, remains the "custodian of the detention center" under § 24-5-10. See Payne v. CCOH , 2012 WL 6801387, at *2 (D.S.C. Nov. 28, 2012), report and recommendation adopted, 2013 WL 81055 (D.S.C. Jan. 7, 2013) ("[T]he sheriff and the county are distinct and separate entities in South Carolina and the sheriff's actions or failures to act do not give rise to a section 1983 action against the county."); see also Grayson v. Peed, 195 F.3d 692 (4th Cir.1999) (finding where a sheriff is charged with administration of a jail, "the county has no control over policy within the jail" and therefore neither the county nor the county council liable under § 1983). No section within Chapter 5 clearly or plainly specifies with whom policymaking authority is vested when the sheriff devolves his

20

authority.  See id. §§ 24-5-12, 20.  Accordingly, no court within this district or South Carolina state court has analyzed Chapter 5 to determine the identity of the final policymaker in the event that the sheriff "devolves" his custody of county jail or defined the "jurisdiction" of a county administrator with respect to a county jail.

In the absence of an express identification of a policymaking official within South Carolina state law materials, the court finds that Director Grant is the final policymaker for BCDC because the record demonstrates that she exercises "authority-in-fact" to create and implement final policy of Beaufort County with respect to BCDC.  See Spell, 824 F.2d at 1386.  In this instance, the court's determination is guided by the Supreme Court's instruction that question is whether Director Grant is a final policymaker "for the local government in a particular area, or on a particular issue," not whether a facility manager acts for the municipality in a "categorical, 'all or nothing" manner.'" See McMillian v. Monroe Cty., 520 U.S. 781, 785 (1997).

Director Grant's implementation of the strip-search policy at BCDC presents "all the hallmarks of a final policymaker wielding her authority."  See Hunter v. Town of Mocksville, N.C., 897 F.3d 538, 557 (4th Cir. 2018) ((citing Valentino v. Village of South Chicago Heights, 575 F.3d 664, 676 (7th Cir. 2009) ("Helpful in determining whether an official is a final decisionmaker is an inquiry into: (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.")).

21

Aside from outlining the municipal governance structure and stating under which department BCDC falls, Beaufort County maintains no policies or ordinances for the operation of BCDC itself.  See Praprotnik, 485 U.S. at 127; Tr. 208:3–210:5; Pl. Exs. 23–25; see also Dotson v. Chester, 937 F.2d 920, 924 (4th Cir. 1991) ("The Praprotnik test indicates liability relies more on final policymaking authority than on the technical characterization of an official as a state or county employee.").  All BCDC policies contained in the manual as required the SC Minimum Standards were established, approved, and implemented by Director Grant.  See Tr. 55:14–58:12.  Officials from every level of Beaufort County government each stated that Director Grant—not the Beaufort County Council or County Administrator—possessed final policymaking authority for BCDC.  See Tr. 19:7–12, 195:20–23, 263:17–19.  When Director Grant created and issued the strip-search policy, she did so with the belief that she was the final policymaker of Beaufort County for BCDC and that it was an essential duty as facility manager to create the policy.  See Tr. 58:4–16.  Because Beaufort County set no policy to be implemented and did not constrain Director Grant's policy and procedure decisions, Director Grant possessed final policymaking authority for BCDC, and the strip-search policy was adopted pursuant to that authority.  See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 966 (4th Cir. 1995) (analyzing the Supreme Court's decision in Pembaur to identify difference between "the authority to make final policy [and] the authority to make final implementing decisions.").

Director Grant's decisions as to the policies and procedures of BCDC were not subject to "meaningful review" by Beaufort County.  See Hunter, 897 F.3d at 555 (citing Praprotnik, 485 U.S. at 127).  From 2005 to 2021, SCDOC reported to Beaufort County

22

that BCDC failed to comply with the SC Minimum Standards for housing pre-class females. Tr. 88:22–25, 143:8–144:4, 166:9–167:2, 185:10–186:9.  Changes to the relevant policies and procedures of BCDC—including the strip-search policy—were established and approved by Director Grant alone, and they were implemented without consultation or review by the Beaufort County Council or County Administrator.  See Tr. 14:24–19:6, 175:24–177:6.  Thus, the "final 'say-so'" over matters concerning BCDC rested with Director Grant and, and her final policymaking decisions were not subject to review by Beaufort County.  See Riddick, 238 F.3d at 523.

The policymaking authority of Director Grant is more than mere discretionary or operational decisions for BCDC—she was vested with final responsibility and control of BCDC.  See Spell, 824 F.2d at 1386.  The record establishes that Director Grant functioned as the final policymaker for Beaufort County concerning the policies and procedures of BCDC and its compliance with both South Carolina law and the SCDOC Minimum Standards.  See McMillian, 520 U.S. at 785.  In the instant case, to hold otherwise would insulate Beaufort County from municipal liability in almost every case concerning detainee treatment at BCDC because Beaufort County has no detainee policies of its own and did not review the policies of Director Grant—a result that the Fourth Circuit has stated is "contrary to the principles underlying Section 1983."  Hunter, 897 F.3d at 558; see also Praprotnik, 485 U.S. at 127 (warning against "egregious attempts by local governments to insulate themselves from liability for unconstitutional policies" through the delegation of policymaking authority to others).

## IV.   CONCLUSION

Based on the foregoing, the court rules for plaintiffs, finding that Beaufort County may be subject to municipal liability under § 1983 because the strip-search policy giving rise to the alleged constitutional violations was the decision of Director Grant who possessed final policymaking authority for Beaufort County concerning BCDC.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 31, 2026**
**Charleston, South Carolina**

24